## ·CHARLESTON

### KIRCHNER *v.* SMITH.

Submitted June8, 1906.    Decided February 5, 1907.

1. PARTNERSHIP—*Implied When.*
   If two or more owners of a mine unite in working it, without any partnership agreement, the act of working it together creates a mining partnership; and the same is true of two or more holding interests in a lease of mining property. (p. 444.)

2. CO-PARTNERS—*Suits for Contribution.*
   In a chancery suit for contribution against his co-partners by a

partner in a mining partnership for money he has paid for such partnership, when he has recovered against them individually certain sums in proportion to their respective interests; in the partnership, it is not error to retain the cause on the docket for further decrees against defendants for contribution in case plaintiff should fail to make on execution or otherwise the several amounts so recovered.   (p. 451.)

3. EVIDENCE.
   All facts having rational probative value are admissible unless some specific rule forbids.   (p. 449.)

4. DEPOSITIONS—*Exceptions—When Waived.*
   If a party wishes to rely upon an exception to a deposition, he must bring it to the attention of the trial court so that it may be acted on, and unless the record shows that this has been done it will be by the appellate court deemed to have been waived.   (p. 446.)

5. EVIDENCE BY ATTORNEY—*When May Be Given—When Not.*
   An attorney employed by two or more persons to give professional advice or assistance in a matter in which they are mutually interested can, on litigation subsequently arising between such persons or their representatives, be examined as a witness at the instance of either, as to communications made when he was acting as attorney for all; although he could not disclose such communications in a controversy between his clients or either of them, and third persons.   (p. 447.)

6. SYLLABUS—*Approved.*
   Syl. point 8 in *Heffleblower* v. *Detrick,* 27 W. Va. 16, and Syl. point 3, *Trust Co.* v. *McClellan,* 40 W. Va. 405, (21 S. E. 1025), approved and applied.   (p. 450.)

7. DECREE—*When Reversible—When Not.*
   A decree will not be reversed for want of replication to an answer, where the defendant has taken depositions as if there had been a replication.   (p. 451,)

(MILLER, JUDGE, Absent.)

Appeal from Circuit Court, Tyler County.

Action by W. E. Kircher against L. E. Smith *et al.* Judgment for plaintiff and defendants appeal.

*Affirmed.*

B. ENGLE; J. H. STRICKLING; and C. R. RIGGLE, for appellee.

J. V. BLAIR; CALDWELL & CALDWELL; PUGH & PUGH; and H. P. CAMDEN, for appellant.

McWHORTER, JUDGE:

On the 8th day of April, 1890, Junius A. McCormick and others assigned and transferred to L. E. Smith certain oil and gas leases described in the paper assigning the same. On the 15th day of September, 1892, the said L. E. Smith aesigned the same to a corporation known as Owls Head Oil Company. Both of the above mentioned assignments were duly acknowledged and recorded in the county clerk's office of Tyler county. Afterwards the Owls Head Oil Company became involved and its effects were levied upon under an execution issued upon a judgment rendered against said corporation and sold by a constable, at which sale Frank P. McNell became the purchaser and took from the constable, St. Myers, of Ohio county, a bill of sale of said effects and on the 9th day of April, 1894, the said McNell sold and transferred all the property of the said Owls Head Oil Company so purchased at the constable's sale, to L. E. Smith, C. H. Taney, T. M. Darrah, C. F. Kotzebue (now represented by Mary E. Matthews, late Kotzebue) J. A. Burgbacher, A. J. Jameson, J. S. Pierpoint, R. A. Martin, John Stealey and W. E. Kirchner, all of whom were stockholders in the said Owls Head Oil Company and holding together 120 shares of stock in the proportions shown in the record. None of the other stockholders in said Owls Head Oil Company participated in the purchase, those named as the purchasers buying for themselves alone. In said purchase were included the various oil and gas leases so transferred to the Owls Head Oil Company by the said L. E. Smith. The purchasers of said property held the same in the proportions in which they had held stock in the said corporation. Among the leases so purchased and held by them was one of July 31, 1889, for a tract of 104 acres more or less, made by W. S. Lawson; one of August 2, 1889, made by David Hickman on a tract of 100 acres more or less; and also one of August 6, 1889, made by E. P. Snyder on a tract of 105 acres more or less; which leases were taken by William Johnson who assigned an interest therein to the said McCormick and others, assignors of said L. E. Smith. On the 13th of May, 1895, at a meeting of all the said ten parties composing the said mining partnership, excepting John Stealey who was not present, the said partnership entered into a contract with

C. P. Tustin, guardian of Harvey Lawson, Ella Lawson, Maggie Lawson, James Lawson and Calvin Lawson, infant children of W. S. Lawson, deceased, and Nathan Lawson and Ida Railing and Milroy Railing her husband of the county of Tyler as parties of the first part with W. E. Kirchner, one of the said partners, of the second part, whereby in consideration of the sum of $2500 cash and of the covenants and agreements made to the party of the second part for a lease, for the purpose of operating and drilling for gas and oil, of a tract of 96 acres of land. Under the agreement the party of the second part was to hold the premises for and during the term of two years from the date of the lease and so long thereafter as oil or gas was produced in paying quantities or rentals paid thereon. The usual 1-8 part of the oil was to be given to the lessors and $300 per annum for each gas well the products of which was utilized off the premises, said lease to become null and void and all rights thereunder cease unless a well should be completed by the party of the second part within one year from the date of the lease; and the party of the second part to pay the other parties at the rate of $2.50 per acre per month in advance from the date of the lease until a well should be completed on the premises; and containing a further provision that the second party, his heirs or assigns, should have the right to at any time surrender up the lease from which time it should be null and void and no longer binding on either party and that all conditions between the parties should be extended to their heirs and assigns.

On the 16th day of August, 1895, the said L. E. Smith, W. E. Kirchner in his own right and as administrator of of C. F. Kotzebue, T. M. Darrah, C. H. Taney, J. A. Burgbacher, A. J. Jameson, J. S. Pierpoint, R. A. Martin and John Stealey (the latter mentioned in the body of the paper but which was not signed or executed by him) in consideration of $2500 paid, granted, assigned and set over to the Carter Oil Company its successors and assigns "all their interest in and to all the leases and contracts on and affecting the W. S. Lawson farm of 96 acres in Meade district, Tyler county, West Virginia"—(followed by a general description of the land)—"including an old Johnson lease on the premises and a lease from C. P. Tustin administrator of the es-

tate of W. S. Lawson, deceased, and guardian of the minor heirs, and the two major heirs; and a contract with B. Forst to complete a well on the premises without cost to the second party.''

On the 16th of August, 1895, C. P. Tustin, guardian, filed his petition in a summary proceeding in the circuit court of Tyler county to sell the interests of the infants in pursuance of said contract and on the 19th of August, 1895, procured a decree from said court to sell the same to said Kirchner, under which decree the said Tustin, as guardian, conveyed the 7-8 of the oil and the gas to the said Kirchner on the 20th of August, 1895. But from the decree and deed made thereunder the provision in the contract of May 13, 1895, of the right of surrender of the said lease by the lessee at any time was left out. At the end of two years from the date of the contract for lease the infants by their next friend, and the adult heirs of W. S. Lawson brought their action of *assumpsit* against Kirchner in the circuit court of Tyler county for the rents accruing under the said contract and obtained judgment for the said rents amounting in all to, including interest and costs, $5667.48, which judgment was affirmed by this Court upon writ of error obtained by the said Kirchner.

At the March rules, 1902, Kirchner filed his bill in equity against the parties interested in said contract for lease at the time it was taken, alleging that they composed at the time a mining partnership and took the lease as such partners and that he held the same for himself and them in trust; and prayed that the said defendants be required to answer; that plaintiff might have an accounting of said partnership business and affairs and that the cause be referred to a commissioner for that purpose; that upon the coming in of the report of said commissioner a decree might be rendered in his favor against the mining partnership for the amount of all moneys found to have been expended by him on account of said judgment, interest, costs, attorneys fees and expenses in said action of *assumpsit* and appeal, together with whatever balance of the judgment and interest accrued and accruing thereon that he might be liable to pay, and that said mining partnership be dissolved and for further and general relief.

The defendants Smith, Taney and Darrah, at the April term, 1902, filed their demurrer to the plaintiff's bill. On July 19, 1902, the court sustained the demurrer and on motion of plaintiff the cause was remanded to rules for an amended and supplemental bill, which was filed at August rules, 1902. In his amended bill plaintiff alleged that he had paid the residue of said judgment and named the persons composing the alleged mining partnership. Alleging that by agreement of the said partners among themselves the whole number of interests or shares in said partnership were 120, owned and held by the members as follows: Smith, 20; Darrah, 22; Burgbacher, 2 1-2; Jameson, 2 1-2; Pierpoint, 5; Martin, 10; Stealey, 16; Matthews 11 and plaintiff 11; and that profits accruing and losses sustained by said mining partnership were shared by the members on the basis of the interests or shares so owned by them respectively as set out; that at a meeting of the members of such partnership, held in the town of Middlebourne, before said suit of Tustin against Susan Lawson, widow and others, was instituted, in which said oil and gas interests were sold and purchased by said partnership in said 96 acres of land, it was agreed that said purchase should be made for the price of $2428.49 of the said guardian and the price was actually paid by said members on the basis of their interests as set out; that it was understood and agreed by and among the said members that plaintiff was to take and hold the legal title to said oil and gas in his name for convenience in transacting the business and to hold the same for the use and benefit of himself and the other members and that he should be governed by the wishes and directions of the members, and in pursuance to the sale made by the said mining partnership of the oil and gas interests to the Carter Oil Company and the wishes and directions of said members he conveyed the same to the said Carter Oil Company by deed; that he caused notice of the pendency of said action of *assumpsit* against him for the rentals to be given to the members of said mining partnership to aid and help defend said suit and gave notice of the judgment to said members and appointed times and places to meet and make arrangements for such defense, but the members failed and refused to aid him in the defense of the suit or to advise him and that all the members had failed and refused to

contribute towards the payment of said judgment, interest, costs, &c., except Burgbacher who paid $118.04 on account of his 2 1-2 shares, Jameson who paid the same, Martin paid $474.16 on account of his 10 shares, Mary E. Matthews paid $519.37 on account of her 11 shares and plaintiff paid the residue of said judgment, costs and expenses, but did not release said members so paying from any further liability that might exist against them on that account; and again praying for an accounting on account of said judgment, costs and expenses and an accounting of said partnership business and affairs, and for general relief.

The defendants Smith, Taney and Darrah, filed their demurrer to the said amended bill, which demurrer was overruled and said demurrants then filed their joint and several answer; and defendant Stealey also filed his answer. To which answer of Stealey the plaintiff replied generally. The defendants Smith, Taney and Darrah, denied the existence of such mining partnership or that they were engaged in leasing lands and operating the same for oil and gas and marketing same as alleged; denied that in the month of August, 1895, said mining partnership purchased in the summary proceeding from Tustin, guardian, the interests of said infant heirs of Lawson or that the deed was made therefor to the plaintiff member of said mining partnership for convenience or that title was vested in him for their benefit, or that the members of said mining partnership were jointly and severally liable to pay said judgment, costs, &c., as alleged or that plaintiff was entitled to an accounting of the so-called partnership; denying all the material allegations of the bill, but averring that the facts were that they were, with plaintiff and different other persons, owners of stock in the Owls Head Oil Company, a corporation, which was owner of divers leaseholds for oil and gas purposes; that respondents with other defendants in this suit became part owners in the oil and gas privileges conveyed by Tustin, guardian, and the adult heirs of W. S. Lawson to Kirchner by contract in writing commonly called an oil and gas lease on the 96 acres bearing date the 13th day of May, 1895, but that it was not true that they with said Kirchner and others entered upon the premises and operated or attempted to operate the same for oil and gas as a mining partnership or other-

wise; that they were such owners of said contract and leases from the 13th day of May, 1895, until the 16th day of August, 1895, when they ·sold and assigned the same to the Carter Oil Company all their interests in and to all the leases and contracts on and affecting the Lawson farm of 96 acres, which sale to the Carter Oil Company was before the said decree of sale and before the sale and confirmation of the sale and before the deed to Kirchner dated August 20, 1895, was made, so that at the time of his acceptance of said deed respondents had not nor had either of them any interest whatever individually or as partners or otherwise in said lands, oil and gas and no interest whatever in said summary proceedings and the acts and doings of said Kirchner therein; and denied that they authorized Kirchner to act for and in behalf of them, that he had no right, power or authority to participate in any purchase or accept any lease or contract or leasehold differently from the terms, conditions and covenants set forth in said agreement of May 13th, 1895, "in which leasehold it was and is stipulated that the same shall become null and void and all rights thereunder shall cease and determine unless a well shall be completed on said premises within one year from the date hereof and party of the second part shall pay to the party of the first part, at the rate of Two dollars and Fifty Cents per acre per month, in advance from the date hereof until a well is completed on the premises hereby leased.

And it is further agreed, that the second party his heirs, or assigns shall have the right at any time to surrender up this lease. Then and from that time this lease and agreement shall be null and void and no longer binding on either party; which stipulations and agreements therein contained were of material concern and interest to these respondents and to the said Carter Oil Company, the assignee of the owners of said lease-hold as hereinbefore set forth." And that the Carter Oil Company refused to purchase of the said Kirchner and to accept a deed of assignment from him of the oil and gas rights and privileges conveyed to him by the deed of the 20th of August, 1895, which differed so materially from the agreement of May 13, 1895, and that if plaintiff was amerced in costs and damages and had· to pay out and expend money by reason of his acceptance of

said deed of August 20, 1895, and by reason of said action of *assumpsit* and judgment for the recovery of rentals it was brought on by his own act unauthorized by respondents or either of them or by the so-called mining partnership, and that he had no right to call on them for contribution. The said Stealey says that from depositions taken in the case he learned of the assignment by McNell April 9, 1894, of all the property of the Owls Head Oil Company purchased by him at constable sale to L. E. Smith, Darrah, Taney, respondent and others; that he was not present when said transfer was made by NcNell nor advised of the meeting nor consulted in regard thereto; that he never authorized or directed said McNell to so convey to him in connection with the other parties, nor did he direct or authorize any person to act for him or in his behalf in said transaction; denied that he was present or was consulted about the contract of May 13, 1895; that he had no part therein and that he never authorized anyone to act for him that he never paid any part of the consideration of the contract of May 13, 1895, that he never was asked to sign nor did he sign the agreement made on the 16th day of August, 1895, between L. E. Smith and others with the Carter Oil Company; that he never in any manner, either personally or through any person, authorized to act for him, to any extent authorized or directed plaintiff Kirchner to purchase the underlying oil and gas pertaining to the Lawson lease-hold under decree of court and take title thereto in his name as alleged in the amended bill; that the action of Kirchner in purchasing said lease-hold as far as respondent was concerned was wholly without authority and as a matter of fact without respondent's knowledge; that he never authorized Kirchner out of any fund received by him from the Carter Oil Company to pay any rentals for the use and benefit of respondent, and that until the reading of depositions of Kirchner and others respondent never knew that such rentals upon said lease-hold had been paid; that he never claimed any interest in said fund and as a matter of fact had no interest in it; and that the act of Kirchner in paying such rentals was purely voluntary and wholly without the knowledge or consent of respondent; that respondent was not indebted to Kirchner nor was he ever indebted to him on account of

matter or business transacted contained in plaintiff's origi-
nal or amended bills; that so far as respondent was con-
cerned said bills were without equity, that he should not
be required to contribute any money for the relief and
benefit of plaintiff as to any matter or transaction al-
leged in his bills, but as to respondent the cause should be
dismissed.

On the 21st day of April, 1904, the cause was heard upon
the bill and amended and supplemental bill and exhibits, the
bills taken for confessed as to all the defendants except
Smith, Taney, Darrah and Stealey, upon the answers and
replication to Stealey's answer, upon the depositions and ex-
hibits filed therewith, and upon a certain contract in writing
between T. M. Darrah and nine others (the defendants and
others) and J. W. Henderson dated October 13, 1897, filed
in evidence by plaintiff, to which counsel for defendants ob-
jected and excepted and moved to strike out, which motion
was overruled, when the court held and so decreed that the
nine defendants named, together with the plaintiff, composed
and formed a mining partnership as alleged in the bill and
amended bill, holding interest or shares in said partnership as
stated making in the aggregate 120 shares or interests and de-
creeing that they should pay to plaintiff the sums aggregating
on the 19th day of March, 1902, the amount of $5,695.97, and
decreed against the defendants therefor in proportion to their
shares or holdings in said partnership, with leave to plain-
tiff to sue out separate executions therefor against the de-
fendants L. E. Smith, C. H. Taney, T. M. Darrah, J. S.
Pierpoint and John Stealey, and continued the cause for fur-
ther decree against said defendants for contribution in case
plaintiff failed to make on execution or otherwise off of said
defendants or either of them the said sums so decreed against
them. From which decree the defendants Smith, Taney,
Darrah and Stealey appealed, and say the court erred in ov-
erruling their demurrers to plaintiff's amended and supple-
mental bill; that the bill fails to make proper averments of
facts upon and from which a mining partnership can be in-
ferred. The bill alleges the names of the ten persons com-
posing the partnership; that the whole number of interests
or shares were one hundred and twenty and showing the
number held by each member, that all profits accrued and

losses sustained by said mining partnership were shared by the members thereof on the basis of the interests or shares owned by them respectively, and all assessments against the members were made on the basis of their respective holdings, and dividends paid in the same way, and all business of said partnership was done and transacted on the same basis; that the purchase price paid for the oil and gas interests in the 96 acres of Lawson land was contributed by the respective members in the same proportion according to their interests or shares as well as the expense attending the procurement of the infants' interests; that the money received from the Carter Oil Company was divided and distributed among the members in the like proportions; that said mining partnership placed or caused to be placed on said 96 acres of Lawson land a boiler and other appliances and caused to be erected a rig to drill for oil and gas thereon by virtue of a certain drilling contract in writing with one Bernard Forst, which said drilling contract by the terms thereof was subsequently, and before the bringing of the action of *assumpsit* for the rentals against plaintiff, forfeited and the interest conveyed by said contract in writing reverted to said mining partnership and passed by virtue of their deed of assignment to the Carter Oil Company. "If two or more owners of a mine unite in working it, without any partnership agreement the act of working it together creates a mining partnership; and the same is true of two or more holding interests in a lease of mining property."—Thornton, Oil & Gas, section 314. "The joint owners of a mine which they unite and co-operate in working, constitute a mining partnership. Without any contract or agreement between them, by the act of uniting in working the mines the relation is established." Bar. & A. Mines & Mining, p. 750. In *Childers* v. *Neeley*, 47 W. Va. 70, (34 S. E. 828,) it is held: "Where tenants in common or joints tenants of an oil lease or mine unite and co-operate in working it, they constitute a mining partnership." The bill in case at bar shows that the plaintiff together with the defendants sought to be charged, were tenants in common, co-owners of the lease-holds, and united in working the same. As a further ground of demurrer it is claimed that the record in the action at law, *Lawson* v. *Kirchner*, filed as exhibit B. with

plaintiff's bill shows that whatever was done by way of operating the Lawson farm was done by the Owls Head Oil Company, a corporation, and refers to the testimony of Burgbacher in said exhibit. It is true he calls it the Owls Head Oil Company, but says it was a partnership at that time; says it was in the month of August, 1895, which was more than a year after the effects of the Owls Head Oil Company had been sold out and purchased by the defendants who had all been stockholders in the Owls Head Oil Company. While the purchasers were all members of the Owls Head Oil Company while it existed, all the stockholders did not participate in the purchase of its property, and the purchasers having been active in the operations of the said corporation, it was not unnatural that the witness should refer to them as the Owls Head Oil people or even as the Owls Head Oil Company. It clearly appears that the operation was by the defendants and not by the Owls Head Oil Company. A further ground of demurrer is, that the record shows that the demurrants had sold out and parted with their interests in the Lawson lease, if any they had, before the rentals accrued for which Kirchner was sued. The bill, which the demurrer admits to be true, shows that the title to the lease given by Tustin, guardian, was made to Kirchner for the benefit of himself and all the defendants, that his name was used for the sake of convenience in transacting the business, that the money paid for the lease was paid by all the parties for whose benefit it was taken and when it was sold to the Carter Oil Company the proceeds $2,500, was distributed amongst them all, each getting his share or proportion according to his holdings in the partnership; that Kirchner's name was used in the summary proceeding to get the infants' title, for all alike in their agreed proportions, the oil and gas were sold to him and he was bound to pay the rent, although paying it for himself and his co-owners, they could not relieve themselves by assigning their equitable interests and let the burden fall upon their fellow, who held the legal title alone, except as to his own tenth interest in it. Demurrants further say that if they were members, of a mining partnership owning the Lawson premises for the purpose of operating the same for oil and gas and conveyed their interests to the Carter Oil Company before ren-

tals had accrued, then plaintiff could have no claim on them but must look to their assignee or grantee. The Carter Oil Company had the contract as well of Kirchner as of all the defendants for a good title and with a surrender clause and could not be made liable for the rentals and was not therefore a necessary party to the bill as claimed by demurrants. The demurrer was properly overruled.

Appellants' second assignment of error is in refusing to sustain their exceptions to the depositions taken on behalf of the plaintiff and in overruling their motion to strike out the contract in writing between Darrah and others and J. W. Henderson, bearing date the 13th of October, 1897. The record does not show that the exceptions taken to the depositions and endorsed thereon in the course of their taking were in any way brought to the attention of the trial court at the hearing or that such exceptions were passed upon by the court, in such case such exceptions will be deemed to have been waived. *Hill* v. *Proctor*, 10 W. Va. 59; *Baxter* v. *Moore*, 5 Leigh 219; *Simmons* v. *Simmons*, 33 Grat. 451; *Rose* v. *Brown*, 11 W. Va. 122; *McVeigh* v. *Chamberlain*, 94 Va. 73, (26 S. E. 395); *Martin* v. *South Salem Land Co.*, 94 Va. 28, (26 S. E. 595); *Fant* v. *Miller*, 17 Grat. 187; *Vanscoy* v. *Stinchcomb*, 29 W. Va. 263, (11 S. E. 927).

It is also strenuously contended by appellants that their objections to the testimony of witnesses Engle and Riggle should have been sustained and the evidence ruled out because of their relationship as attorney and client with the plaintiff Kirchner; that "these men were acting on the 13th day of May, 1895, as attorneys at law for the parties to this suit. All that they learned upon that day during the negotiations and consultations in their office, was through and by reason of that confidential, and almost sacred relation;" that any directions given them by the parties or any of them respecting the proceedings to obtain a valid title of the infants' interest in the lease-hold for oil and gas, and any advice they gave on that occasion could not be legitimately divulged by them in this case without the consent of all the parties who employed them. The same rule would apply to the exception to the depositions of these witnesses as to the others just mentioned, but in case the objections had been especially called to the attention of the court, and overruled, the ruling

would have been correct.  This is a case in which all the
parties, the plaintiff and the defendants, who constitute the
mining partnership, together employed the said Engle and
Riggle as attorneys to prepare the contract with Tustin,
guardian, conduct the summary proceedings to obtain the
title of the infants to the Lawson land and to advise them
therein; as between themselves there was no privileged com-
munications.  In 23 A. & E. E. L. 65, we find:  "An attor-
ney employed by two or more persons to give professional
advice or assistance in a matter in which they are mutually
interested can, on litigation subsequently arising between
such persons or their representatives, be examined as a wit-
ness, at the instance of either, as to communications made
when he was acting as attorney for all.  But he cannot dis-
close such communications in a controversy between his
clients, or either of them, and third persons."  In *Sparks*
v. *Sparks*, 51 Kan. 195, it is held that:  "Communications
made to an attorney who was acting for both parties
and made in the presence of both parties cannot be re-
garded as confidential and privileged."  Citing *Goodwin
& Co.'s Appeal*, 117 Pa. St. 574; *Whiting* v. *Barney*, 30
N. Y. 330; *Britton* v. *Lorenz*, 45 *Id.* 51; *Hanlon* v. *Doherty*,
109 Ind. 37; *Dunn* v. *Amos*, 14 Wis. 106; *De Wolfe* v. *Stra-
der*, 26 Ill. 225; *Machette* v. *Wanless*, 2 Colo. 169; 1 Whar.
Ev., section 587.  And in *Hurlburt* v. *Hurlburt*, 128 N. Y.
420, where it is held that "The provision of the Civil Code
Procedure (Par. 835) prohibiting an attorney from disclosing
professional communications made to him by his client does
not apply as between the parties, to communications made
by two or more persons in consultation with an attorney for
their mutual benefit; it cannot be invoked in any litigation
which may thereafter arise between such persons, although
it seems it may in a litigation between them and a stranger."
And "When two persons employ an attorney in the same
business, communications made by them in pursuance of such
common retainer are not privileged *inter sese. Gulick* v.
*Gulick*, 39 N. J. Eq. 516.  In section 587, Volume I, Mr.
Wharton, in his work on Evidence, says:  "It is easy to
conceive of cases in which two or more persons address a
lawyer as their common agent.  So far as concerns a stranger
their communications to the lawyer would be privileged.  It

is otherwise, however, as to themselves; as they stand on the same footing as to the lawyer, either could compel him to testify against the other as to their negotiations. See also *Lynn* v. *Lyerle*, 113 Ill. 125; *Griffin* v. *Griffin*, 125 Ill. 430; *Cady* v. *Walker*, 62 Mich. 157, 4 Am. St. 834; 6 Cur. Law 1985, section 4. Besides the authorities cited, the same doctrine has been held in the states of Alabama, California, Kentucky, Missouri, Nebraska, Nevada, North Carolina, Oregon, Texas and doubtless others. These witnesses, Engle and Riggle, in the meeting of May 13, 1895, were employed as attorneys alike for the plaintiff Kirchner and the defendants composing the mining partnership for their mutual benefit, the promotion of their common interests and under the authorities cited there could be no privileged communications between them and their attorneys as among or between themselves, hence the witnesses were competent to testify.

Appellants say the court erred in overruling their motion to strike out as evidence the contract in writing between T. M. Darrah and others and J. W. Henderson, dated October 13, 1897, offered with the deposition of the plaintiff. The lease-hold described and assigned in this paper was a part of the leases sold by the constable to McNell as the property of the Owls Head Oil Company and assigned by McNell to the ten persons constituting the alleged mining partnership. This contract of sale recites the fact that the parties of the first part sold and transferred thereby to the said J. W. Henderson all of their interests respectively "in and to the leases held by the parties of the first part in fifteen (15) acres compromise of the E. P. Snider tract of land, and also for two locations on the thirty (30) acres, part of the E. P. Snider tract of land now owned by D. W. Snider, which two locations were secured to the parties of the first part by a compromise, reference to which agreement of compromise respectively is hereto made.

The said compromise agreements are to be turned over to the party of the second part as evidence of the rights of the parties of the first part, in said tract of land together with all the oil heretofore and hereafter produced from said tracts of land, and all the machinery, rigs, boilers, engines, casing, tubing, rods, tankage, and all other necessary fixtures and appurtenances thereto and thereon situated on the two tracts

aforesaid.'' The consideration of this agreement was $17,-
000. It is shown by this assignment on its face that the
defendants had been operating for oil on said premises as it
speaks of oil theretofore and thereafter produced as well as
of machinery and all necessary fixtures and appurtenances
for operating for oil. 1 Wig. on Ev., section 10, says: ''All
facts having rational probative value are admissible unless
some specific rule forbids.'' No specific objection was made
to this paper, simply a general objection to its introduction
and consideration with a motion to strike out the same.
This paper has probative value especially in view of the an-
swer filed by John Stealey wherein he disclaims all interest
in the property assigned to him and others by McNell, pur-
chaser of the Owls Head Oil Company's property. This
assignment of Darrah and others of October 13, 1897, rep-
resents a part of the lease-holds so assigned by McNell to
Stealey and others and in this assignment the said Stealey
realized his proportion of the $17,000 consideration from
Henderson for the said conveyance. The contract was
properly admitted.

Special effort is made to relieve the defendant John Stealey
from any liability on account of the Tustin contract of
May 13, 1895. Stealey filed an answer to the bill
an amended bill in which he admits being a
stockholder in the Owls Head Oil Company, but deny-
ing participation in the purchase of the Tustin, guardian,
lease and denying also that he had any interest in the as-
signment made by McNell of the 9th of April, 1894, but we
find not only the sale to J. W. Henderson of October 13,
1897, joined in by said Stealey, which was a transfer of a
part of the lease-hold so assigned by McNell to Stealey and
others of the effects of the Owls Head Oil Company, but we
find on the day that the said defendants and Kirchner made
the contract with Tustin, guardian, May 13, 1895, John
Stealey with the other nine members of the mining partner-
ship executed a contract with Bernard Forst, dated May 11,
1895, but acknowledged on the said 13th day of May, assign-
ing to said Forst an undivided three-eighths interest in what
is known as the ''Old William Johnson'' lease on the said
W. S. Lawson tract, dated July 31, 1889, called in said lease
104 acres, but shown by the record to be the same tract of

96 acres mentioned in the Tustin lease, and one of the leases sold as the property of the Owls Head Oil Company for the assignment of which interest said Forst was to begin forthwith to drill an oil well on said "W. S. Lawson lease and drill same as rapidly as possible and without avoidable delay, down to and through the Big Indian sand if necessary so as to make it a well to thoroughly test said last named leasehold;" but to be drilled entirely at the expense of Forst. The interest that Stealey had in said lease-hold can only be accounted for through the assignment of McNell of the property purchased by him of the Owls Head Oil Company. The Tustin lease was to supplement and perfect the title held by the said mining partnership in the Lawson land. All the circumstances go to show beyond question that John Stealey was a partner with the other members of the firm in their operations in buying and selling and operating oil leases. Another circumstance which adds strongly to this conclusion is that said Stealey failed to go upon the witness stand to sustain the averments of his answer and to contradict the statements made tending to show his interest in the said partnership. If it was a fact that he had no interest in the partnership, he should have proved the same by his own testimony and subjected himself to cross-examination that his contention might have a clear showing. There was no one had such peculiar knowledge of his interest in the matter as Stealey himself and surely the evidence connecting him with the partnership was of such a character taken together with all the circumstances of the cause as to call upon him to offer the best evidence at his command to overcome the *prima facie* case made against him by the plaintiff. In *Heffleblower* v. *Detrick*, 27 W. Va. 16, it is held: "Where a party has in his possession or under his control, evidence, by the introduction of which at the trial he would be able to render certain, a fact material to his success, which is otherwise left in doubt, and he withholds such evidence, the court will upon a demurrer to the evidence introduced by his adversary, presume that the fact was against him." Also in *Trust Co.* v. *McClellan*, 40 W. Va. 405, (21 S. E. 1025), Syl. point 3: "Where the burden is on a party to a suit to prove a material fact in issue, the failure, without excuse, to produce an important and necessary witness to such fact,

raises the conclusive presumption that such witness' testimony, if introduced, would be adverse to the pretensions of such party." See also *Wells-Stone* v. *Truax*, 44 W. Va. 531. The evidence establishes the fact that the parties bought the Tustin lease, that the title thereto was perfected by their counsel, Engle and Riggle, under the direction of all the members of the company who were present, the defendant L. E. Smith being the principal spokesman for the company, and the attorneys were instructed to get such title from the infants as would not be forfeited in case the rentals should not be paid strictly on time. While there is some conflict in the evidence there is a strong preponderance thereof establishing the mining partnership as alleged in the bill; and the direct evidence taken together with all the circumstances of the case make it reasonably certain that John Stealey was a member of said partnership and liable as such.

Defendants Taney, Smith and Darrah contend that the decree ought to be reversed as to them because there was no replication to their answer. Section 4, chapter 134, section 4035 Code, 1906, provides: "No decree shall be reversed for want of a replication to the answer, where the defendant has taken depositions as if there had been a replication; nor shall a decree be reversed at the instance of a party who has taken depositions, for an informality in the proceedings, when it appears that there was a full and fair hearing upon the merits, and that substantial justice has been done." And in *Moore* v. *Wheeler*, 10 W. Va. 35, it is held: "A decree will not be reversed for want of a replication to the answer when the defendant has taken depositions as if there had been a replication." *Richardson* v. *Donehoo*, 16 W. Va. 685; *Chalfants* v. *Martin*, 25 W. Va. 394; *Skaags* v. *Mann*, 46 W. Va. 209, 220, (33 S. E. 110); *Martin* v. *Kester*, 49 W. Va. 647, 653, (39 S. E. 599); *Paxton* v. *Paxton*, 38 W. Va. 616; *Goddin* v. *Vaughn*, 14 Grat. 102, 131; Justis' Anno. 942.

It is claimed to be error holding said suit on the docket for further decrees and in refusing to dismiss the bills. It was necessary to retain the cause for the final adjustment between the parties in case the plaintiff should not be able to collect from all the parties against whom he so recovered the amounts thereof, and it was proper to retain the cause until the execution of the court's decrees. We see no reversible error in said decree and therefore affirm the same.

*Affirmed.*